Karl ALEXANDER, et al.

v.

MORNING PRIDE MANUFACTURING,
INC.

Donald PARKER, et al.

v.

MORNING PRIDE MANUFACTURING,
INC.

Anthony MERCER, et al.

v.

MORNING PRIDE MANUFACTURING,
INC.

Civil Action Nos. 92–1403,
93–971 and 93–4434.

United States District Court,
E.D. Pennsylvania.

Nov. 28, 1995.

Robert B. Bodzin, Molly Peckman, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, PA, for plaintiffs.

Lloyd George Parry, A. Gale Seider, David, Riter, Cramer & Jamieson, Philadelphia, PA, for defendant.

*MEMORANDUM*

RAYMOND J. BRODERICK, District Judge.

Thirty-six Philadelphia firefighters, thirty-five of whom were burned at the knees and one of whom was burned at the shoulders and forearms while fighting structural fires, brought this products liability action against Morning Pride Manufacturing, Inc. ("Morning Pride"), the manufacturer of their protective clothing known as bunker gear. The firefighters claim that they were burned because Morning Pride failed to provide warnings necessary to make the bunker gear safe for its intended use.

This case was tried three times. The first two trials resulted in hung juries. Finally, at the third trial, the jury found that each of the thirty-six firefighters had proved by a preponderance of the evidence that Morning Pride was liable to each of them because it had failed to provide adequate warnings about the risks of the burn injuries each received while wearing the bunker gear and that its failure to provide adequate warnings was a proximate cause of each of their burn injuries. The jury assessed a total of $977,000.00 in compensatory damages. On March 10, 1995, after hearing evidence as to punitive damages in the second part of the bifurcated trial, the jury returned a verdict in favor of Morning Pride.

Before the Court is Morning Pride's post-trial Motion for Judgment as a Matter of Law pursuant to Fed.Rule Civ.P. 50(b). Morning Pride contends that some of the firefighters failed to meet their burden of proving by a preponderance of the evidence that the inadequate warning proximately caused their injuries. Defendant also contends that the firefighters failed to meet their burden of proving that the warning was inadequate because they did not present expert testimony on the inadequacy of the warning. Morning Pride also asserts that Section 388 of the Restatement (Second) of Torts is a defense to this Section 402A action.

Also before the Court is the firefighters' motion for a new trial on their claim for punitive damages. The firefighters contend that during the punitive damages phase of the trial, the Court improperly admitted evidence of Morning Pride's communications with the Philadelphia Fire Department and the firefighters' union concerning the knee burn problem.

The Court will deny both Morning Pride's Motion for Judgment as a Matter of Law and the firefighters' Motion for a New Trial on Punitive Damages.

*A. Procedural Background*

This action was originally filed on March 6, 1992. Two other actions, filed on February 24, 1993 and August 17, 1993, were consolidated with the original action on September 10, 1993. Jurisdiction is based on diversity of citizenship.

In the first trial, which took place in March of 1994, the jury considered the cases of thirty-nine firefighters. In the second trial, which took place in July of 1994, the jury considered the cases of thirty-six firefighters. In the third trial, there were also thirty-six firefighters.

On January 27, 1995, prior to the third trial, the Court issued a bifurcation order directing the parties to present evidence in the first part of the trial relevant only to the firefighters' strict liability claims based on the failure to warn and compensatory damages. The parties were specifically instructed that in the first phase of the trial, evidence as to state of the art and evidence of industry standards, custom and usage, negligence and/or contributory negligence, good faith, and due care would not be admitted. The firefighters' claims for punitive damages were to be tried in the second part of the bifurcated trial.

As required by the Pennsylvania Supreme Court's 1978 decision of *Azzarello v. Black Brothers Co.*, 480 Pa. 547, 391 A.2d 1020 (1978), *see also Mackowick, et al. v. Westinghouse Electric Corp.*, 525 Pa. 52, 575 A.2d 100 (1990); *Nowak, et al. v. Faberge USA, Inc., et al.*, 32 F.3d 755 (3d Cir.1994), at the close of the firefighters' case-in-chief, the Court, outside the presence of the jury, ruled that the evidence presented showed that the bunker gear was in an unreasonably dangerous and defective condition when it was sold

to the City of Philadelphia because it lacked adequate warnings. The Court found that the label was insufficient to put each firefighter on notice that he could be burned through his bunker gear when he kneeled or otherwise compressed the gear while fighting a structural fire. The Court also denied Morning Pride's Motion for Judgment as a Matter of Law pursuant to Fed.Rule Civ. Proc. 50.

At the conclusion of the liability phase of the trial, the Court instructed the jury that because there were thirty-six firefighters in the case, they should consider the liability of Morning Pride separately as to each individual firefighter. The jury was provided with thirty-six verdict forms, one for each firefighter. The verdict form contained the following question as to liability:

Has the plaintiff, (individual firefighter's name inserted here), proved by a preponderance of the evidence that the bunker gear was in a defective condition in that Morning Pride Manufacturing, Inc. failed to adequately warn him of the risks of the burn injuries that he received and that the defendant's failure to adequately warn him was a proximate cause of his injuries?

Yes _____ No _____

For each firefighter for whom the jury answered "Yes" to question one, the jury was instructed to proceed to question 2, which read as follows:

In what amount do you assess compensatory damages in favor of the plaintiff, (individual firefighter's name inserted here), against the defendant, Morning Pride Manufacturing, Inc.?

$_____

After deliberating for more than two days, the jury returned a verdict in favor of each of the firefighters. Reflecting the fact that the evidence showed that some of the firefighters were injured more severely than others, the jury assessed compensatory damages as follows:

| | | |
|---|---|---|
| 1. | William Brightcliffe | $1,400.00 |
| 2. | Edward Cooper | $7,000.00 |
| 3. | Reginald Masten | $8,000.00 |
| 4. | Donald Parker | $40,000.00 |
| 5. | William Paull | $5,500.00 |
| 6. | Harry Downey | $7,700.00 |
| 7. | Gene Lancaster | $2,000.00 |
| 8. | Stanley Frank Edmondson | $4,000.00 |
| 9. | Oscar Williams | $1,500.00 |
| 10. | Patrick McTameny | $38,000.00 |
| 11. | Karl Alexander | $130,000.00 |
| 12. | Andrew Frosch | $6,000.00 |
| 13. | Daniel Roats | $20,000.00 |
| 14. | Thomas Sroka | $2,000.00 |
| 15. | Fernando Gonzales | $400.00 |
| 16. | Charles Blake | $400.00 |
| 17. | William Hawkins | $5,000.00 |
| 18. | John Toland | $1,000.00 |
| 19. | Charles Sessions | $1,500.00 |
| 20. | Carlton Grymes | $10,000.00 |
| 21. | Derek Paige | $10,000.00 |
| 22. | Kevin Fann | $340,000.00 |
| 23. | Eugene Simon | $3,500.00 |
| 24. | Samuel Marks | $400.00 |
| 25. | Edward Hengy | $1,000.00 |
| 26. | Herbert Young | $400.00 |
| 27. | Joseph Steinmetz | $400.00 |
| 28. | James Curtis | $1,500.00 |
| 29. | Anthony Mercer | $300,000.00 |
| 30. | Ronald Donnelly | $15,000.00 |
| 31. | Charles Harvey | $2,500.00 |
| 32. | James Huckel | $3,200.00 |
| 33. | Howard Bloomfield | $4,000.00 |
| 34. | Leon Nixon | $400.00 |
| 35. | Bruce Slaughter | $2,500.00 |
| 36. | Richard Owens | $800.00 |
| | TOTAL: | $977,000.00 |

### B. The Evidence

Each of the thirty-six firefighters testified that he had been burned fighting a structural fire while wearing his Morning Pride bunker gear. Each firefighter described in detail the circumstances under which he was burned and the physical and emotional consequences of his injury. The evidence presented during the eleven days of testimony on liability and compensatory damages may be summarized as follows:

All thirty-six firefighters are residents of Philadelphia, Pennsylvania and were employed by the Philadelphia Fire Department at the time of their injuries. The firefighters were burned between March 4, 1990 and May 26, 1993. Thirty-five of the thirty-six firefighters were burned at or around the knee. One firefighter suffered severe burns to his shoulders and forearms.

The severity of each firefighter's burns varied from first to third degree. The firefighters with third degree burns required skin grafts, a painful procedure whereby skin is removed from another part of the body, usually the thigh, and grafted to the burned area to permit healing. According to a few

of the firefighters, the skin graft procedure was even more painful than the burns. Some of the firefighters required another painful procedure called debriding where the scab forming on the burned area was stripped away to permit the injured tissue to heal. As reflected by the jury's individual damage assessments, not only did the degree of injury vary from firefighter to firefighter, but the long term consequences of the burns also varied. Some of the firefighters returned to work at their next tour of duty or missed only a few days from work while others missed several weeks of work and were required to go on light duty upon their return. The evidence showed that two of the firefighters will not be able to return to active duty as firefighters because of continuing physical and emotional injuries being suffered as a result of their burns. Some of the firefighters testified that they continue to experience pain at the site of their burns. Many of the firefighters have permanent scars as a result of their burns, and some firefighters developed scar tissue known as keloids.

Most of the firefighters were "tipmen" at the time they were burned. The "tipman" is usually the first firefighter to enter a burning structure and is so called because he carries the tip of the hose. The "tipmen" are often exposed to higher heat than firefighters who perform other tasks at the site of the fire. Most of the firefighters testified that they were burned when their knees came into contact with a hot surface while they were kneeling in an effort to keep low. The testimony showed that their bunker gear became tightly compressed around the knee area while they were kneeling.

Morning Pride, an Ohio Corporation, has been designing and selling protective clothing for firefighters for more than seventy (70) years. Morning Pride has about 200 employees and is the second largest manufacturer of fire fighting equipment in the world. Their exclusive business is designing and manufacturing protective equipment for firefighters.

In 1989, the City of Philadelphia awarded Morning Pride a contract to provide bunker gear to the Fire Department. Bunker gear consists of a coat and pants and is usually worn with knee-high rubber boots as well as other safety equipment including a self-contained breathing apparatus, a helmet, a hood and gloves. When clothed in bunker gear together with the other safety equipment, the firefighter is "fully encapsulated". Almost no part of the firefighter's body is exposed. Morning Pride measured and custom fitted each individual firefighter on the force in 1989 for their bunker gear. Firefighters who joined the force after 1989 were generally not custom fitted for their gear.

Morning Pride represented their bunker gear as being specifically designed to protect firefighters from the hazards associated with structural fire fighting. There was no dispute among the parties in this litigation that because heat rises, the safest place to be when fighting a structural fire is close to the floor. The standard techniques employed by most structural firefighters in order to avoid extreme heat at higher levels is to kneel, duck walk (walking in a crouched or squat position), or crawl. Morning Pride's bunker gear was designed to enable firefighters to employ these standard techniques in fighting structural fires.

The evidence shows that shortly after the first shipment of the custom-fitted bunker gear was distributed to the firefighters in 1989 and 1990, firefighters began reporting that they had been burned at the knees while fighting structural fires in their new bunker gear. As pointed out above, the firefighters were burned between March 4, 1990 and May 26, 1993. The Vice President of Morning Pride, Mary Grilliot, testified that she believed that Philadelphia firefighters were undergoing a "horrendous experience" because they were being burned at the knees in their bunker gear when they knelt to fight a structural fire.

The evidence shows that prior to their receipt of Morning Pride's bunker gear, Philadelphia firefighters wore long "running coats" and "hip boots" to fight structural fires. Morning Pride manufactured the running coats and most of the hip boots worn by the Philadelphia firefighters prior to 1989. Although the "running coat" and "hip boots" did not appear to provide as much protection

to the firefighter as the new bunker gear, those firefighters who had been fighting fires prior to receiving bunker gear had not suffered knee burns to the extent that they were now being burned in bunker gear. Some of the firefighters testified that they had fought fires for ten or fifteen years in their old "running coat" and "hip boots" and had not been burned. Their testimony showed that while wearing the "hip boots" they were able to feel a "warming" at the knees which gave them sufficient time to withdraw their knees from the heated surface. The evidence from the firefighters who had worn the "running coat" and "hip boots" showed that they fully expected the new bunker gear to give them at least as much, if not more, protection than their old equipment. They fully expected the bunker gear to protect them when they were fighting structural fires on their knees, as they were trained to do in order to keep low. One twenty-two year veteran of the Philadelphia Fire Department testified that had he been aware of the bunker gear's limitations, he would have chosen to continue to wear his "running coat" and "hip boots."

The testimony showed that unlike their experience in the "hip boots", many of the firefighters had difficulty interpreting the sensations they felt at their knees in the bunker gear. Some did not even realize they were burned until they emerged from the fire and removed their gear. Others described feeling a "tingling" sensation at the knees that they did not necessarily associate with burning. And still others realized they were burned, but had not felt any sensations alerting them that they should withdraw from their knees. There was evidence which showed that alarm time, or the difference between the time to pain and the time to second degree burn, was reduced in the bunker gear such that the firefighters did not have time to adjust their position before being burned.

Although the evidence clearly showed that the firefighters had no reason to be aware of the risk that they could get burned in their new bunker gear while kneeling to fight structural fires and that the bunker gear performed differently than the running gear and hip boots, the evidence showed that Morning Pride never warned the firefighters of the bunker gear's inherent limitations and possible risks. Morning Pride never warned the firefighters that they might feel different sensations in the new bunker gear than they had in the old running gear, that under certain circumstances alarm time might be reduced, or that the firefighters needed to modify their fire fighting techniques in order to avoid being burned in their new bunker gear.

The label sewn into the bunker gear contained no warning of the danger of burns the firefighters faced. The bunker gear distributed to these firefighters contained the following label (enlarged for readability):

*MORNING PRIDE MFG CO. INC.*
*1986 HOME AVE/PO BOX 557*
*DAYTON, OHIO 45417 USA*
*1-513-263-2683 FAX 1-513-268-5208*

*THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE REQUIREMENTS OF NFPA 1971, STANDARD ON PROTECTIVE CLOTHING FOR STRUCTURAL FIRE FIGHTING, 1991 EDITION. NFPA 1500, STANDARD ON FIRE DEPARTMENT OCCUPATIONAL SAFETY AND HEALTH PROGRAM PROVIDES USE REQUIREMENTS FOR PROTECTIVE CLOTHING.*

*WARNING*
*FOR STRUCTURAL FIRE FIGHTING OPERATIONS. BOTH PROTECTIVE COAT AND PROTECTIVE TROUSERS MUST BE WORN FOR LIMB/TORSO PROTECTION. PROTECTIVE COAT/PROTECTIVE TROUSER OVERLAP IS REQUIRED BY NFPA 1500. OUTER SHELL, MOISTURE BARRIER, AND THERMAL BARRIER MEETING REQUIREMENTS OF NFPA 1971 MUST BE UTILIZED, AND ALL GARMENT CLOSURES MUST BE FASTENED WHEN IN USE. DO NOT USE PROTECTIVE COAT AND PROTECTIVE TROUSERS ALONE FOR STRUCTURAL FIRE FIGHTING OPERATIONS; OTHER PROTECTIVE EQUIPMENT—HELMET, SCBA, GLOVES, FOOTWEAR, PASS—IS*

*REQUIRED FOR PROTECTION. DO NOT KEEP THIS GARMENT IN DIRECT CONTACT WITH FLAMES. THIS GARMENT ALONE MAY NOT PROVIDE PROTECTION FOR PROXIMITY OR FIRE ENTRY APPLICATIONS OR FOR PROTECTION FROM CHEMICAL, RADIOLOGICAL, OR BIOLOGICAL AGENTS. KEEP THE GARMENT CLEAN AS SOILING WILL REDUCE PROTECTIVE QUALITIES.*

*–DO NOT USE CHLORINE BLEACH–*

*CHLORINE BLEACH WILL SIGNIFICANTLY COMPROMISE THE PROTECTION AFFORDED BY THE TEXTILE AND FILM MATERIALS UTILIZED IN THE CONSTRUCTION OF THIS GARMENT. USERS MUST CLEAN, MAINTAIN, AND ALTER ONLY IN ACCORDANCE WITH MANUFACTURER'S INSTRUCTIONS. DO NOT STORE IN DIRECT SUNLIGHT. NO PROTECTIVE CLOTHING CAN PROVIDE COMPLETE PROTECTION FROM ALL CONDITIONS—USE EXTREME CARE FOR ALL EMERGENCY OPERATIONS. FAILURE TO COMPLY WITH THESE WARNINGS MAY RESULT IN SERIOUS INJURY OR DEATH.*

Not only did the label fail to warn the firefighters about the risk of the burn injuries they received, but the testimony of the firefighters showed that the label did not adequately communicate the information it did contain. Many of the firefighters testified that they viewed the label as care and washing instructions and not a warning about the gear's limitations. "DO NOT USE CHLORINE BLEACH" was the most eye catching warning. Many of the firefighters found the label difficult to read because of its size, location in the bunker gear, and because it faded after a few wearings. In addition, the information provided about the bunker gear's limitations was obvious to the firefighters. As experienced structural firefighters, they already knew that bunker gear was not intended for chemical or proximity fires and that they should avoid direct flames.

The bunker gear came packaged in two clear plastic bags and included a "User Information Sheet." The User Information Sheet included the following: "Cleaning Instructions"; "Doffing Instructions (or instructions about taking gear on and off)"; "Maintenance Criteria"; "Repairs/Customer Changes"; "Warranty Information"; "Size, Fit and Protective Overlap"; "Safety Considerations"; "Storage Conditions"; "Decontamination"; "Retirement Considerations"; and "New Garment Stiffness." As with the label in the gear, the User Information Sheet contained no statement informing the firefighters that they could get burned through their bunker gear while using standard fire fighting techniques for staying low such as kneeling.

The evidence was abundantly clear that the only way the firefighters were warned about the inherent limitations of their bunker gear was through the painful process of being burned. As the Court instructed the jury, a manufacturer's duty to warn of the inherent limitations of a product is a continuing one. Nevertheless, the testimony was clear that even after Morning Pride learned the "horrendous" news that Philadelphia firefighters were being burned, Morning Pride never warned them, although it could have easily contacted all Philadelphia firefighters directly and warned them of the gear's limitations.

In July 1991, after learning that Philadelphia firefighters were being burned, particularly at the knees, and based on a report by Dr. James Veghte, Morning Pride produced a revised user information sheet adding a section on "Wetness/Compression":

Wetness and compression both reduce system insulation. When the system is BOTH wet and compressed, (i.e. firefighter kneeling after sweating in his liner); the decrease in protection is even more pronounced (even worse the decrease is in the area of warning time). Users are cautioned that the system should be kept as dry and non-compressed as possible for maximal protection. This can be accomplished with . . . dual sets of gear (so a dry set can be used each run).

The evidence showed that not one of the thirty-six firefighters in this case ever received a copy of this revised user information sheet. Morning Pride stopped using the revised sheet in April, 1994.

After being burned, the firefighters employed a variety of techniques to avoid future burns while wearing Morning Pride's bunker gear. Some of the firefighters stopped kneeling altogether. One of the firefighters began using knee pads. Another rested his knees on the hose to avoid direct contact with a hot surface. Another firefighter modified his boots by adding a rubber extension to cover his knees.

## C. Defendant's Motion for Judgment as a Matter of Law

■ In evaluating a renewed motion for judgment as a matter of law pursuant to Rule 50(b), the Court must review the record in the light most favorable to the non-moving party. The Court must determine whether there is sufficient evidence upon which a reasonable jury could properly have reached its verdict. *Gomez v. Allegheny Health Services, Inc., et al.*, 71 F.3d 1079 (3d Cir.1995).

Morning Pride contends that the firefighters failed to meet their burden of proving by a preponderance of the evidence that the failure to warn was a proximate cause of each firefighter's injuries. As the Court instructed the jury, each firefighter was required to prove by a preponderance of the evidence that if there had been an adequate warning, he would have modified his behavior so as to avoid the burn injuries he received. *See, e.g., Phillips v. A–Best Products Co.*, 665 A.2d 1167 (Pa.1995); *Overpeck v. Chicago Pneumatic Tool Co.*, 823 F.2d 751, 755 (3d Cir. 1987). On the issue of causation, the Court further instructed the jury that it need not find that the Defendant's conduct was the sole cause of the injury because a wrongful act may be the legal cause of the injury even though other causes may have joined with it in producing the final result. The Court told the jury that they could find Morning Pride liable if they found that the warning was inadequate and the it was either the sole or substantial contributing causes in bringing about each of the firefighter's burns.

Morning Pride claims that the firefighters did not produce sufficient evidence as to proximate cause because they failed to show that the burns which they suffered were the result of wetness and compression. The firefighters' case was not, as Morning Pride's contention suggests, premised on the theory that the bunker gear was defectively designed. The firefighters proceeded on the theory that the bunker gear was in a defective condition because Morning Pride failed to provide adequate warnings of the gear's inherent limitations and possible risks. As a plurality of the Supreme Court of Pennsylvania stated in the *Berkebile v. Brantly Helicopter Corp.*, 462 Pa. 83, 337 A.2d 893, 902 (1975):

> The seller must provide with the product every element necessary to make it safe for use. One such element may be warnings and/or instructions concerning use of the product. A seller must give such warning and instructions as are required to inform the user or consumer of the possible risks and inherent limitations of his product.

*See also Mackowick v. Westinghouse Elec. Corp.*, 525 Pa. 52, 575 A.2d 100, 102 (1990) ("It is well settled a dangerous product can be considered 'defective' for strict liability purposes if it is distributed without sufficient warnings to notify the ultimate user of the dangers inherent in the product.")

■ In a failure to warn case, the plaintiff does not have the burden of showing a specific design defect to meet its burden of proving by a preponderance of the evidence that the failure to warn proximately caused the injury. A "finding of failure to warn does not require a finding of defective design." *Petree v. Victor Fluid Power, Inc.*, 831 F.2d 1191, 1197 (3d Cir.1987); *Greiner v. Volkswagenwerk Aktiengeselleschaft*, 540 F.2d 85, 92–93 (1976). It is the failure to provide an adequate warning that makes the product defective even if the "product had been perfectly designed and manufactured." *Berkebile*, 337 A.2d at 903. In this case, the firefighters presented an abundance of evidence that the warnings accompanying the bunker gear were inadequate in that they did not inform the firefighters of the unobvious

risks and inherent limitations of the bunker gear and that Morning Pride's failure to provide such an adequate warning was a proximate cause of their injuries.

Thirty-six firefighters were burned combatting structural fires. This was convincing evidence from which the jury could conclude that the gear contained inherent limitations about which the defendant had failed to provide adequate warnings. The firefighters' expert witness testified that wetness and compression reduces the insulative and protective qualities of bunker gear and that his experiments showed that alarm time was lower in bunker gear than in the running boots. Mary Grilliot, the Vice President of Morning Pride, stated that between July of 1991 and April of 1994, the period during which many of the firefighters were burned, Morning Pride believed that wetness and compression was an inherent limitation of the bunker gear that resulted in the reduction of its protective qualities. Based on this belief, Morning Pride updated its user information sheet to include a statement about wetness and compression. This user information was never delivered to the firefighters in this litigation and was subsequently withdrawn by Morning Pride. No evidence was presented that Morning Pride ever warned the firefighters concerning the risks of the burn injuries they received.

The Court has determined that each firefighter produced more than sufficient evidence to warrant the jury answer "yes" to question number one of the verdict form. Each firefighter proved by a preponderance of the evidence that the bunker gear was in a defective condition in that Morning Pride failed to adequately warn him of the risks of the burn injuries that he received and that Morning Pride's failure to adequately warn him was a proximate cause of his injuries.

■ In support of its contention that the firefighters' failed to meet their burden as to proximate causation, Morning Pride also claims that some firefighters testified that they did not read the warning labels in their bunker gear. There was ample evidence to support the jury's finding that the label sewn into the firefighters' bunker gear as well as the user information sheet were inadequate

warnings. The Court instructed the jury that a warning is adequate if it notifies the intended user of the unobvious dangers inherent in the product. An adequate warning must be reasonably calculated to attract the user's attention to the true nature of the danger due to its position, size and coloring of its lettering and its location on the product. The jury was specifically told that if the warning was inadequate, the firefighter's failure to read it does not relieve Morning Pride of liability.

As set forth above, the evidence showed that the warning provided by Morning Pride was inadequate. And not only was the warning inadequate in content, the evidence is also clear that its form was not sufficient to attract attention. The testimony showed that the lettering was small, the location in the gear made it awkward to read, and it appeared to contain only washing instructions. Moreover, the information provided about the limitation of the gear for fire fighting non-structural fires such as chemical and proximity fires was obvious to the firefighters. It was not obvious, however, that they would not be able to use the standard techniques for combatting structural fires such as kneeling. As the Court charged the jury, an inadequate warning is tantamount to no warning at all. *See Nowak v. Faberge U.S.A., Inc.*, 812 F.Supp. 492, 498 (M.D.Pa. 1992), *aff'd*, 32 F.3d 755 (3d Cir.1994); *see also Spruill v. Boyle–Midway, Inc.*, 308 F.2d 79, 87 (4th Cir.1962) (holding that the failure to read an insufficient warning did not relieve the manufacturer of liability because the giving of an inadequate warning is as complete a violation of its duty as would be the failure to give any warning.)

■ Defendant also contends that some of the firefighters failed to testify that an adequate warning would have caused them to alter their behavior and avoid their injuries, and that they therefore failed to meet their burden of showing that the failure to warn proximately caused their injuries.

Again, the record shows that there was ample evidence presented at trial from which the jury could find that an adequate warning would have caused the firefighters to modify

their fire fighting techniques to avoid the burn injuries they received. As pointed out above, the firefighters' reasonable expectation was that the bunker gear would protect them under the circumstances they faced fighting structural fires. Therefore, it stands to reason from such testimony that an adequate warning which conveyed information about the bunker gear's inherent limitations for this type of fire fighting would have caused the firefighters to alter their methods for combatting such fires. Also as set forth above, there was a great deal of testimony that after learning about the inherent limitations of the new bunker gear, the burned firefighters changed their techniques. They avoided kneeling on hot surfaces or devised ways to give additional protection to their knees. A reasonable jury could find that the firefighters modified their fire fighting tactics to avoid future burns.

■ Morning Pride also contends that it is entitled to judgement as a matter of law as to firefighters Bloomfield and Slaughter on the ground that both testified that they were burned when they accidentally fell to their knees and that an inadequate warning could not have been a proximate cause of their injuries. The jury could have found that if they had an adequate warning, they would have removed themselves quickly from the hot surface. Furthermore, the jury was instructed that it could find that the inadequate warning proximately caused a firefighter's injury even if it determined that the inadequate warning was not the sole cause but a substantial factor in bringing about the injury.

■ Morning Pride contends that the firefighters were required to present expert testimony that the warning was inadequate. Expert testimony is not required unless the issue is beyond the comprehension of a lay person. It follows then that expert testimony was not required to determine the adequacy of the warning in this case. The jury heard from the firefighters that the warning was inadequate. The bunker gear was designed and manufactured for use by firefighters. No one was better able than the firefighters to determine whether the warning was inadequate.

■ Morning Pride next contends that § 388 of the Restatement (Second) of Torts and, specifically, comment n to § 388 provides Morning Pride with a defense requiring the entry of judgment in its favor. Comment n provides:

> **Warnings given to third person,** states that a supplier's duty to warn is discharged by providing information about the product's dangerous propensities to a third person upon whom it can reasonably rely to communicate the information to the ultimate users of the product or those who may be exposed to its hazardous effects.

This defense is often referred to as the "sophisticated user" defense. However, as pointed out by Judge Mansmann in *Smith v. Walter C. Best, Inc.,* 927 F.2d 736, 741 (3d Cir.1990), in Pennsylvania, this "defense is available only in cases involving negligent failure to warn." In this case, the firefighters proceeded to trial exclusively pursuant to § 402A of the Restatement (Second) of Torts. This was not a negligent failure to warn case.

In *Berkebile,* the Pennsylvania Supreme Court clearly stated: "We hold today that the reasonable man standard in any form has no place in a strict liability case." *Berkebile,* 337 A.2d at 900. The *Berkebile* Court also stated that "[w]here warnings or instructions are required to make a product non-defective, it is the duty of the manufacturer to provide such warnings in a form that will reach the ultimate consumer and inform of the risks and inherent limits of the product. The duty to provide a non-defective product is non-delegable." *Id.* at 903. In *Kimco Development Corp. v. Michael D's Carpet Outlets,* 536 Pa. 1, 637 A.2d 603, 606–607 (1993), the Pennsylvania Supreme Court reiterated its adherence to strict liability standards by excluding negligence concepts: "The deterrent effect of imposing strict product liability standards would be weakened were we to allow actions based upon it to be defeated, or recoveries reduced by negligence concepts."

In a 1993 case, *Phillips v. A.P. Green Refractories Co.,* 428 Pa.Super. 167, 630 A.2d 874 (1993), the Pennsylvania Superior Court,

having determined that it was impracticable for the supplier to give adequate warnings directly to all who may use the product (silica sand), held that the "sophisticated user" doctrine was a defense to a 402A strict liability claim. Reviewing this decision on appeal, the Pennsylvania Supreme Court recently stated: "Since we have resolved the first issue in favor of Appellee, we need not discuss the merits of importing the negligence-based "sophisticated user" defense embodied in § 388 of the Restatement (Second) of Torts into our strict liability law." *Phillips v. A–Best Products Company,* 665 A.2d 1167, 1172 (Pa.1995). This Court again predicts that the Supreme Court of Pennsylvania will continue to adhere to its long established policy of excluding negligence concepts from the strict liability standards of § 402A, particularly in a case such as this where Morning Pride was both the manufacturer and the seller of the bunker gear and it was obviously known to Morning Pride that the bunker gear would be distributed to Philadelphia firefighters for fighting fires in Philadelphia.

### D. The FireFighters' Motion for a New Trial as to Punitive Damages

The firefighters have requested a new trial on punitive damages on the ground that in the punitive damages phase of the trial the Court erred in admitting evidence of Morning Pride's communications with the Fire Department and the firefighters' union about the knee burn problem. The firefighters assert that this evidence was more prejudicial than probative and should have been excluded under Fed.R. of Evidence 403. The firefighters' basis for error is without foundation.

 Federal Rule Civil Procedure 59(a) provides that in an action where there has been a trial by jury, a "new trial may be granted to all or any of the parties and to all or part of the issues". As with a movant for judgment as a matter of law, a movant for a new trial faces heavy burden. A new trial should be granted to prevent injustice or to correct a verdict that was against the weight of the evidence. *American Bearing Co. v. Litton Industries,* 729 F.2d 943, 948 (3d Cir. 1984). The trial court's decision to grant a new trial based on an evidentiary ruling is broad. *Klein v. Hollings,* 992 F.2d 1285, 1289–90 (3d Cir.1993).

 Punitive damages are proper when a defendant's conduct is outrageous because of the defendant's evil motive or reckless indifference to the rights of others. *Feld v. Merriam, et al.,* 506 Pa. 383, 485 A.2d 742, 747 (1984). Pursuant to the Pennsylvania Superior Court's decision of *Nigro v. Remington Arms Co., Inc.,* 432 Pa.Super. 60, 637 A.2d 983 (1993), *appeal dismissed,* 540 Pa. 49, 655 A.2d 505 (1995). The Court ruled that evidence of Morning Pride's communications with the Fire Department and the firefighters' union about the knee burn problem was inadmissible during the strict liability phase of the trial. The *Nigro* Court stated:

> While the element of knowledge or intention, which is irrelevant to a claim for strict liability, is particularly relevant in the context of a claim for punitive damages.
>
> It follows, therefore, that where the focus of attention is not the character of the product but the knowledge of the defendant, state of the art evidence, otherwise irrelevant to the proof of the basic product design cause of action, addresses a material issue in litigation. Compliance with industry standards and custom tends to support the defense the Remington acted with a nonculpable state of mind, and would negate an inference of wanton indifference to the rights of others.

*Id.* at 989. Evidence of Morning Pride's communications with the Fire Department and the firefighters union was properly admitted in the punitive damages phase of the trial because it was relevant to whether Morning Pride acted with a culpable state of mind. Such evidence was not more prejudicial than probative. The Court will deny the firefighters' motion for a new trial as to punitive damages.

### E. Conclusion

One could not sit through three trials of this case without being impressed with the dedication and courage of Philadelphia's firefighters. A Philadelphia firefighter has no hesitancy risking his or her life to rescue

someone trapped in a fire. They need fire fighting gear which will provide them with protection upon which they can rely.

For the reasons set forth above, the Court will deny Morning Pride's Motion for Judgment as a Matter of Law and the firefighters' Motion for a New Trial as to Punitive Damages.